KILPATRICK TOWNSEND & STOCKTON LLP
DENNIS L. WILSON (Bar No. 155407)
DWilson@ktslaw.com
CAROLINE Y. BARBEE (Bar No. 239343)
CBarbee@ktslaw.com
1801 Century Park East Suite 2300
Los Angeles, CA  90067
Telephone:   310-248-3830
Facsimile:    310-860-0363

KRISTIN M. ADAMS (Admitted *Pro Hac Vice*)
KMAdams@ktslaw.com
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6138

Attorneys for Plaintiff
META PLATFORMS, INC.

KIRSTEN A. HART (SBN 258433)
kirsten.hart@afslaw.com
OSCAR A. FIGUEROA (SBN 313238)
oscar.figueroa@afslaw.com
ARENTFOX SCHIFF LLP
555 South Flower Street, 43rd Floor
Los Angeles, CA  90071
Telephone:    213.629.7400

Attorneys for Plaintiffs
CHRISTIAN LOUBOUTIN S.A.S.,
CHRISTIAN LOUBOUTIN L.L.C., and
CLERMON ET ASSOCIES

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| META PLATFORMS, INC., a Delaware corporation; CHRISTIAN LOUBOUTIN S.A.S.; CHRISTIAN LOUBOUTIN L.L.C., a New York limited liability company; and CLERMON ET ASSOCIES, <br><br> Plaintiffs, <br><br> v. <br><br> CESAR OCTAVIO GUERRERO ALEJO, <br><br> Defendant. | CASE NO.: 5:23-cv-05923-NW <br><br> [~~PROPOSED~~] JUDGMENT AND PERMANENT INJUNCTION <br><br> **DATE:** March 31, 2026 <br> **TIME:** 10:00 a.m. <br> **PLACE:** Courtroom 3, 5th Floor <br> **JUDGE: The** Hon. Noël Wise <br> **Complaint filed:** November 16, 2023 |

Before the Court is the Motion for Default Judgment filed by Plaintiffs Meta Platforms, Inc. ("Meta"), Christian Louboutin S.A.S., Christian Louboutin L.L.C., and Clermon et Associés (collectively, "Louboutin," and together with Meta, "Plaintiffs") on February 3, 2026 (the "Motion"). The Motion was properly noticed for hearing on March 31, 2026 at 10:00 AM.

Upon consideration of all filings in connection with the Motion, as well as all pleadings, the Court rules as follows:

## I.  FINDINGS OF FACT

### A.  Procedural Background

1. On November 16, 2023, Plaintiffs Meta and Louboutin filed the Complaint in this action against Defendant Cesar Octavio Guerrero Alejo. Dkt. 1 ("Compl.").

2. On September 12, 2024, the Mexican Central Authority effected service of process on Defendant in accordance with the Hague Convention. Dkt. No. 20. Plaintiffs received proof of service on September 4, 2025, and Plaintiffs filed the proof of service on September 5, 2025. *Id.*

3. Having been served on September 12, 2024, Defendant's responsive pleadings were due on October 3, 2024. Fed. R. Civ. P. 12(a)(1)(A)(i). Defendant failed to meet that deadline.

4. On November 21, 2025, Plaintiffs moved for entry of default under Federal Rule of Civil Procedure 55(a). Dkt. No. 25.

5. On November 24, 2025, the Clerk entered default under Federal Rule of Civil Procedure 55(a), and Defendant has not moved to set it aside. Dkt. No. 27.

6. To date, Defendant has not appeared in this action or otherwise demonstrated any intention to defend against Plaintiffs' claims. Declaration of Caroline Y. Barbee ¶ 2.

### B.  Plaintiff Meta

7. Meta owns and operates Facebook and Instagram. Compl. ¶ 17.

8. Facebook is a social networking website and mobile application that enables its users to create their own personal profiles and connect with each other on their personal computers and mobile devices. *Id.*

9. Instagram is a photo and video sharing service, mobile application, and social

network that, among other things, allows users to post photos and videos to their profile and to view, comment on, and like posts shared by others on Instagram. *Id.* ¶ 18.

10.    All Facebook users agree to Meta's Terms of Service ("Meta TOS") and other rules that govern access to and use of Facebook. *Id.* ¶ 19. Similarly, all Instagram users agree to Instagram's Terms of Use ("Instagram TOU," collectively with the Meta TOS, "Meta Terms"). *Id.* ¶ 20.

11.    Since April 2018, the Instagram TOU have stated that the Instagram TOU constitute an agreement between Instagram users and Facebook, Inc., now known as Meta. Declaration of Michael P. Duffey ("Duffey Decl.) ¶ 5.

12.    Section 3.1 of the Meta TOS requires users to "[u]se the same name that [they] use in everyday life," "[p]rovide accurate information about [them]self," "[c]reate only one account ([their] own)," and use that account "for personal purposes," and prohibits users from using Facebook if Meta "previously disabled [a user's] account for violations of [the TOS] or [Facebook] Policies." Compl. ¶ 21; Duffey Decl. Ex. 2 at 3.

13.    Section 3.2.1 of the Meta TOS prohibits users from: (a) doing anything "unlawful, misleading, [] or fraudulent"; and (b) doing anything that "infringes or violates someone else's rights, including their intellectual property rights." Compl. ¶ 22; Duffey Decl. Ex. 2 at 4.

14.    The Instagram TOU prohibit users from (a) "do[ing] anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose"; (b) "do[ing] anything that violates someone else's rights, including intellectual property"; (c) "impersonat[ing] someone or something you aren't"; (d) "violat[ing] . . . [Instagram] Terms or [Instagram] policies"; and (e) using Instagram if Meta "previously disabled your account for violation of law or any of [Instagram's] policies." Compl. ¶ 23; Duffey Decl. Ex. 1 at 3.

15.    In addition to Meta prohibiting Facebook and Instagram users from posting content that infringes third parties' intellectual property rights, including copyright infringement, trademark infringement, and the promotion, sale, or advertisement of counterfeit goods (Compl. ¶ 24; Duffey Decl. Ex. 1 at 4, Ex. 2 at 4. Meta has a variety of measures and tools in place to help people and organizations protect their intellectual property rights across its platforms and services

PROPOSED] JUDGMENT AND PERMANENT INJUNCTION                                           - 2 -
CASE NO.: 5:23-CV-05923-NW

and to combat infringements, including counterfèits, on its platforms and services. Compl. ¶ 24.

16.    For example, Meta operates a global notice-and-takedown program that provides dedicated communication channels for rights holders to report posts or other user-generated content they believe to be infringing, including content on Facebook and Instagram that promotes, advertises, or sells counterfeit goods. *Id.* ¶ 25.

17.    Meta makes available publicly accessible reporting forms to streamline and expedite the reporting of intellectual property violations, including a form for reporting counterfeits specifically. *Id.* Meta reviews these reports and, if a report is complete and valid, removes the reported content. *Id.* ¶ 26. Meta also notifies both the reporter and the violating user of the fact of and reason for the removal. *Id.* If there is evidence of widespread infringement, rather than remove only the reported post, Meta disables the account. *Id.* ¶ 27. Likewise, Meta disables the accounts of Facebook and Instagram users who repeatedly violate the Terms prohibiting violations of the intellectual property rights of others. *Id.* This "repeat infringer" policy applies to numerous surfaces, including Facebook accounts, Pages, groups, ad accounts, and Instagram accounts. *Id.* When a repeat infringer's account is disabled, Meta informs the user that they are no longer permitted to use its service. *Id.*

### C. Plaintiff Louboutin

18.    Christian Louboutin is a luxury brand founded in 1991 in Paris, recognizable by its trademarked signature and red soles. The Christian Louboutin name and mark have been used in commerce in the United States since 1992. Declaration of Xavier Ragot ("Ragot Decl."), ¶ 3.

19.    The Louboutin brand luxury product offerings include, inter alia, women's and men's shoes, belts, handbags, beauty products, and other accessories. *Id.*, ¶ 4.

20.    Such products are distributed and sold throughout the United States under the Louboutin marks, including the CHRISTIAN LOUBOUTIN word mark; the CHRISTIAN LOUBOUTIN and LOUBOUTIN script signature logo marks; the RED SOLE position mark; and the RED SOLE logo mark, U.S. Reg. Nos. 1,816,940; 3,361,597; 3,425,538; 3,206,366; 3,376,197; 3,876,383; 4,654,832; 4,438,425; and 4,442,328. *Id.*, ¶ 5; *see also* Compl., Ex. 1.

21.    Louboutin makes significant efforts to protect its intellectual property from

PROPOSED] JUDGMENT AND PERMANENT INJUNCTION                                  - 3 -
CASE NO.: 5:23-CV-05923-NW

infringers and counterfeiters worldwide. Ragot Decl., ¶ 6. Louboutin has adopted a zero-tolerance policy and has put in place a comprehensive program to deal with bad actors attempting to sell fake Louboutin merchandise. *Id*., ¶ 7. Through its "Stopfake" online program (https://stopfake.christianlouboutin.com/en/), Louboutin has endeavored to educate and encourage consumers to spot and avoid counterfeit Louboutin-branded products. *Id*., ¶ 8.

22.     Additionally, Louboutin actively cooperates and partners with U.S. Customs and Border Protection and other law enforcement agencies in the United States and around the world to identify and combat illegal counterfeiting. Louboutin regularly pursues legal action to stop online counterfeiters. *Id*., ¶ 9; *see also* Compl., ¶ 35.

### D. Defendant's Relevant Conduct

23.     At all relevant times, Defendant has been bound by the Meta Terms, including as of November 16, 2023, when Meta deactivated multiple of Defendant's Facebook and Instagram pages that Defendant used to offer counterfeit Louboutin-branded goods. Compl. ¶¶ 37, 44-49.

24.     As early as June 2020, Defendant's Facebook and Instagram accounts and Facebook Pages listed dozens of inauthentic products for sale featuring designer brand names, including Louboutin, through his multiple Facebook and Instagram accounts. *Id.* ¶ 42.

25.     All Facebook and Instagram users, including Defendant in connection with each of his user accounts, must agree to the Meta Terms and continue to be bound by the Terms unless the user deletes his Facebook and Instagram accounts. *Supra* Section 2(B); *see* Duffey Decl. ¶¶ 2-4, Ex. 2 at 7 (Meta TOS explaining that "if you "wish to terminate your agreement to this contract, you can delete your account at any time"), Ex. 1 at 6 (Instagram TOU explaining that if you "wish to terminate your agreement to this contract, you can do so by deleting your account").

26.     Between at least June 2020 and November 2023, Defendant used his Facebook and Instagram accounts to promote inauthentic goods offered for sale, including inauthentic Louboutin-branded products. Compl. ¶ 44.

27.     On June 2, 2015, Defendant created a Facebook Page called "Luxury Sinaloa," on which Defendant created a Facebook post on June 2, 2020, that included Defendant's contact information and a pair of counterfeit Louboutin-branded sneakers for sale. *Id.* ¶ 45; Duffey Decl. ¶

9, Ex. 3.

28. On November 16, 2023, Meta disabled "Luxury Sinaloa" for violating the Meta TOS against violating third parties' intellectual property rights. Compl. ¶ 45.

29. Using an Instagram account Defendant had created on February 11, 2018 with the username "shopcg_cln," on January 30, 2023, Defendant posted his contact information and offered three pairs of counterfeit Louboutin-branded sneakers for sale to the United States and Mexico. Compl. ¶ 46; Duffey Decl. ¶ 10, Ex. 4.

30. On November 16, 2023, Meta disabled the "shopcg_cln" account for violating the Instagram TOU's prohibition against violating third parties' intellectual property rights. *Id.*

31. On or around May 13, 2023, Louboutin's agent purchased a pair of inauthentic shoes from Defendant advertised on yet another of his Instagram accounts, "el_oso_shop." *Id.* ¶ 47. Louboutin's agent communicated with Defendant through Meta's WhatsApp service and made payment to Defendant through a Western Union location in the San Francisco area. *Id.* Defendant confirmed receipt of the Western Union payment on the same day. *Id.* On May 17, 2023, Louboutin's agent received a DHL shipment at its San Francisco, California address with a return address from Culiacán, Sinaloa. *Id.* The shipment contained a box with a pair of shoes in a white cloth bag with multiple references to "Christian Louboutin." Compl. ¶ 47. Louboutin confirmed the shoes purchased from Defendant are not genuine. Compl. ¶ 47.

32. Between May 3, 2010 and January 11, 2023, Defendant created and maintained at least 44 Facebook user accounts. Compl. ¶ 38.

33. Between October 15, 2015 and December 28, 2022, Defendant created and maintained at least 32 Instagram accounts. *Id.* ¶ 39.

34. Defendant created and maintained at least 30 Facebook Pages, 19 Business Manager accounts, and 19 ad accounts. Compl. ¶ 40.

35. Since October 2022, to protect Facebook and Instagram users and in response to reports by Louboutin, Meta has taken multiple enforcement actions against Defendant for violating the Meta Terms. *Id.* ¶ 48. These include disabling his accounts on Facebook and Instagram and removing posts that promoted inauthentic products. *Id.* However, Defendant

continued to access and use Facebook and Instagram without permission. *Id.*

36.   On November 16, 2023, Facebook disabled additional Facebook and Instagram accounts and Pages controlled by Defendant. *Id.* ¶ 49.

* * * * *

## II.   CONCLUSIONS OF LAW

37.   When a default judgment is sought against a non-appearing party, a court must examine its subject matter jurisdiction over the causes of action and its personal jurisdiction over the non-appearing party, including whether the "procedural requirement of service of summons" has been satisfied. *Tech. LED Intell. Prop., LLC v. Revogi, LLC*, No.18-cv-03827-JSC, 2019 WL 2716610, at *2 (N.D. Cal. June 27, 2019).

38.   On September 12, 2024, the Mexican Central Authority effected service of process on Defendant in accordance with the Hague Convention. Dkt. No. 20. Accordingly, service of process was proper. *See Sluchevsky*, 2020 WL 5823277, at *5 (granting default judgment where service of process was completed pursuant to the Hague Convention). After proper service, Defendant did not respond to the Complaint, and the Clerk entered default. Dkt. No. 27.

### A.   The Court Has Subject Matter and Personal Jurisdiction.

39.   Because Louboutin alleges federal trademark infringement under the Lanham Act, this Court has subject matter jurisdiction. 28 U.S.C. §§ 1331, 1338(a), (b); *see also* Compl. ¶ 8. "As a result, the Court also has supplemental jurisdiction over [Plaintiffs'] related state law claims." *Vietnam Reform Party v. Viet Tan - Vietnam Reform Party*, 416 F. Supp. 3d 948, 961 (N.D. Cal. 2019) (citing 28 U.S.C. § 1367); *see also* Compl. ¶ 10.

40.   Where "the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts," and "uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (cleaned up).

41.   This includes Meta's state law claim for breach of contract (Compl. ¶¶ 101-09), which arises out of the same common nucleus of operative facts as Louboutin's federal trademark claims: *i.e.*, all of the claims arise from Defendant's use of Facebook and Instagram accounts to

facilitate his trade in counterfeit and infringing Louboutin-branded goods. Compl. ¶ 44; *Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*, 108 F. Supp. 3d 816, 823 (N.D. Cal. 2015) (court had supplemental jurisdiction over contract claim arising out of the same "common nucleus of operative facts" as infringement claims).

42.     The Court also has diversity jurisdiction over all claims under 28 U.S.C. § 1332.

43.     Complete diversity exists because Plaintiffs are citizens of California (Meta), New York (Christian Louboutin L.L.C.), and France (Christian Louboutin S.A.S. and Clermon et Associés), while Defendant is a citizen of Mexico. Compl. ¶¶ 3-7.

44.     The amount in controversy also exceeds $75,000. *Id*. ¶ 11.

45.     A forum selection clause is construed as consent by the parties to the personal jurisdiction of the courts of the selected forum. *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 458 (9th Cir. 2007). Forum selection clauses are *prima facie* valid and specifically enforceable unless the party opposing the clause clearly shows "that enforcement would be unreasonable or unjust, or that the clause is invalid for such reasons as fraud or overreaching." *Maneti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).

46.     Defendant consented to personal jurisdiction in this Court when he created and continued to use Facebook and Instagram accounts and thereby agreed to the forum selection clauses in the Meta Terms requiring him to submit to the personal jurisdiction of this Court. Compl. ¶¶ 12-13; Duffey Decl. ¶¶ 2-4, Ex. 1 at 7 (assenting to personal jurisdiction if dispute "aris[es] out of or relate[s] to these Terms or your access or use of the Meta Products"), Ex. 2 at 7-8 (assenting to personal jurisdiction if dispute "aris[es] out of or relate[s] to these Terms or Instagram"); *Facebook, Inc. v. Sluchevsky*, No. 19-CV-01277-JSC, 2020 WL 5823277, at *2 (N.D. Cal. Aug. 28, 2020), *report and recommendation adopted,* No. 19-CV-01277-YGR, 2020 WL 5816578 (N.D. Cal. Sept. 30, 2020) (granting motion for default judgment and enforcing Facebook's forum selection clause to exercise personal jurisdiction over Ukrainian nationals in litigation initiated by Facebook).

47.     Although the forum selection clauses discussed above are sufficient to confer

jurisdiction, specific jurisdiction also exists based on Defendant's contacts with California as to both Meta's and Louboutin's claims. Personal jurisdiction over a nonresident defendant is proper if permitted by a state's long-arm statute and if its exercise would not violate federal due process. *In re W. States Wholesale Nat'l Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013).[1] To satisfy due process, a nonresident defendant must have minimum contacts with the forum such that asserting jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

48.    Specific jurisdiction in California exists whenever a nonresident defendant: (1) purposefully directed activities at California or its residents or performed some act by which he purposefully availed himself of the privilege of conducting activities in California; (2) at least one claim arises out of or relates to those activities; and (3) the exercise of jurisdiction is reasonable. *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1086 (9th Cir. 2023). "Purposeful availment" and "purposeful direction" under the specific jurisdiction test are distinct concepts. *Schwarzenegger*, 374 F.3d at 802-03. A purposeful availment analysis is used in contract disputes; and a purposeful direction analysis is used in cases alleging tort claims. *Id.; see also Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) (finding trademark case "akin to a tort case").

49.    As to Meta's contract-based claim, this Court has personal jurisdiction over Defendant because he purposefully availed himself of the privilege of conducting business in California; as to Louboutin's tort-based claims, Defendant purposefully directed his activities at California. As to all claims, Defendant has not shown, and cannot show, unreasonableness.

50.    Defendant purposefully availed himself of the benefits and protections of a California forum. "Parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.'" *Sluchevsky*, 2020 WL 5823277, at *3 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)). Defendant knowingly directed and targeted

---

[1] California's long-arm statute authorizes specific personal jurisdiction over a nonresident defendant to the full extent permitted by the Due Process Clause of the United States Constitution. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).

his actions at California through his use of Meta's services, which has a principal place of business in California. Compl. ¶ 3.

51.    Defendant has created and used at least 44 Facebook user accounts, 32 Instagram user accounts, 30 Facebook Pages, 19 Business Manager accounts, and 19 ad accounts, including after June 2020 to offer counterfeit Louboutin-branded goods. *Id.* ¶ 38-40, 44-48. Each time Defendant created, used, or retained Facebook and Instagram accounts, he contracted with Meta in California and agreed to California law in the choice-of-law provision in the Meta Terms. *Id.* ¶¶ 19-20; Duffey Decl. ¶¶ 2-4, Ex. 1 at 7, Ex. 2 at 7-8; *see Google, Inc. v. Eolas Techs. Inc.*, Nos. 13–cv–05997–JST; 13–cv–06003–JST, 2014 WL 2916621, at *3 (N.D. Cal. June 24, 2014) (finding defendant's agreement to California choice-of-law provision evidenced purposeful availment); *Sluchevsky*, 2020 WL 5823277, at *3-4 (finding purposeful availment based, in part, on defendant's acceptance of California choice-of-law provision in Facebook Terms).

52.    Defendant knew that Meta would likely expend time and resources in California to investigate and remediate Defendant's actions because Defendant was aware that Meta was repeatedly required to analyze his reported infringing conduct and to act to deactivate his content and accounts, which "underscores the harm [Defendant] inflicted in the forum state." *Sluchevsky*, 2020 WL 5823277, at *4. "But for [Defendant's] decision to [act unlawfully in connection with Meta's] servers . . . [Meta] would not have expended resources in California to investigate and remediate [Defendant's] conduct, nor would [Meta] be suing" Defendant. *Facebook v. Sahinturk*, No. 20-CV-08153-JSC, 2022 WL 1304471, at *5 (N.D. Cal. May 2, 2022) ("The Court also agrees that Plaintiffs' expenditure of resources in California to detect and remediate the damage done by [defendant's] activities . . . underscores that [defendant] inflicted harm in the forum state.").

53.    Defendant also purposefully directed his activities at California by transacting business and engaging in commerce in California because he (1) committed an intentional act; (2) expressly aimed at California; that (3) caused harm that Defendant knew would likely be felt in California. *See, e.g.*, *Sluchevsky*, 2020 WL 5823277, at *4; *Calder v. Jones*, 465 U.S. 783, 788–89 (1984).

54.    Defendant's intentional acts include receipt and confirmation of payment for counterfeit Louboutin products from a Western Union location in the San Francisco, California area and shipping the counterfeit Louboutin products to a San Francisco, California address. Compl. ¶ 47. Defendant expressly negotiated this sale of counterfeit Louboutin shoes via the WhatsApp service directly with the purchaser and therefore was personally aware that the counterfeit product would be sent into California and that he would be receiving funds from California. Compl. ¶ 37.

55.    The "arising from" requirement is satisfied here because Plaintiffs would not have been injured "but for" Defendant's forum-related activities, including (1) the duties Defendant undertook and breached when he contracted with Meta in order to offer and sell counterfeit Louboutin-branded products, and (2) Defendant's knowing receipt of funds from and sending of a specifically negotiated-for counterfeit product to a known address in California. Compl. ¶¶ 1, 12-14, 19-23, 37-48. *See Learjet Inc. v. Oneok, Inc.*, 715 F.3d 716, 742 (9th Cir. 2013); *see also, e.g.*, *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1394, 1400 (9th Cir. 1986) (finding "arising from" requirement satisfied because plaintiff's claim arose out of insurance contract between the defendant and a third party, which constituted the defendant's contact with California).

56.    Defendant also expressly targeted a California entity (Meta), caused Meta to expend significant time and resources to combat Defendant's unlawful activity, and damaged the goodwill among Meta users, all in a manner that caused harm felt in California. *See CollegeSource*, 653 F.3d at 1079 (noting that a corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business."); *Nissan Motor Co. v. Nissan Comput. Corp.*, 89 F. Supp. 2d 1154, 1160 (C.D. Cal. 2000) (defendant's exploitation of plaintiffs' goodwill had effect of injuring plaintiff in California.).

57.    "Because the first two requirements for exercising specific personal jurisdiction ha[ve] been established," Defendant must present a "compelling case" that the assertion of jurisdiction would be unreasonable. *See Yelp, Inc.*, 70 F. Supp. 3d at 1082, 1094. Defendant, however, has "waived [his] opportunity to make this showing by failing to participate in this

PROPOSED] JUDGMENT AND PERMANENT INJUNCTION                                                      - 10 -
CASE NO.: 5:23-CV-05923-NW

litigation." *Id.*

58.    Further, because Defendant specifically targeted a California company and knowingly negotiated an agreement to send counterfeit goods into California through his illicit business activities and conducted business in California, Defendant "had 'fair warning' that [he] might be sued in California." *Id.*

59.    "[A] court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative fact with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery v. Atlantic Embroidery*, 368 F.3d 1174, 1180-81 (9th Cir 2004); *see also Netapp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 827 (N.D. Cal. 2014) (exercising pendent personal jurisdiction over state law contract claims along with federal tort-based claims because the claims were based on the same common factual predicates).

60.    Pendent personal jurisdiction is also proper as Meta's state law claim for breach of contract because it arises out of the same common nucleus of operative facts as Louboutin's federal trademark claims: *i.e.*, Defendant's use of Facebook and Instagram accounts to trade in counterfeit Louboutin-branded products such that the exercise of pendent personal jurisdiction would be proper. *See In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1173 (S.D. Cal. 2018).

61.    Further, personal jurisdiction exists over Defendant in connection with Louboutin's federal claims pursuant to Federal Rule of Civil Procedure 4(k)(2) because Defendant has been served and exercising personal jurisdiction is consistent with the United States Constitution and laws, as detailed *infra* Section III(A)(2).

### B. Plaintiffs Are Entitled to Default Judgment.

62.    Rule 55(b)(2) grants a court discretion to enter a judgment by default against any party that fails to plead or otherwise defend as required by the rules. *Philip Morris USA Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 498 (C.D. Cal. 2003). The Ninth Circuit has identified seven factors that courts should consider in deciding whether to enter default judgment:

(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). The *Eitel* factors strongly support entry of default judgment in favor of Plaintiffs.

63.  The first factor favors a default judgement. Plaintiffs "will suffer prejudice if the court denies default judgment" (*Baskin-Robbins*, 2020 WL 2616576, at *7). Because Defendant has not appeared or ceased his counterfeiting activity in response to Plaintiffs' efforts, "in the absence of a default judgment, plaintiff[s] 'would be without other recourse for recovery' to which [they are] entitled." *Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010) (citation omitted); Ragot Decl., ¶¶ 6-8; Duffey Decl. ¶ 11; Compl., ¶¶ 1, 35, 48.

64.  The second and third *Eitel* factors favor a default judgment because Plaintiffs have "plead[ed] facts sufficient to establish and succeed upon [their] claims." *Craigslist*, 694 F. Supp. 2d at 1055. The "well-pleaded factual allegations in the complaint, except those concerning damages, are deemed to have been admitted by the non-responding party." *Tech. LED Intell.*, 2019 WL 2716610, at *3.

65.  Defendant is liable to Louboutin for its claims of trademark infringement, counterfeiting, trademark dilution, and common law and California unfair competition.

66.  To prevail on a trademark infringement action, a plaintiff must show (1) ownership of a valid, protectable trademark and (2) the alleged infringer's "use of the same or a similar mark causes a likelihood of confusion in the minds of the relevant consuming public." *JUUL Labs, Inc. v. Chou*, 557 F. Supp. 3d 1041, 1051 (C.D. Cal. 2021). Federal registration of a trademark provides prima facie evidence of the mark's validity and entitles the plaintiff to a strong presumption that the mark is protectable. *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).

67.  A counterfeit is "a non-genuine mark identical to the registered, genuine mark of another, where the genuine mark was registered for use on the same goods to which the infringer

applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 945-946 (9th Cir. 2011); *see also* 15 U.S.C. § 1127. "Although likelihood of confusion is ordinarily a factual determination made using an eight factor test, 'in cases involving counterfeit marks, it is unnecessary to perform the step-by-step examination ... because counterfeit marks are inherently confusing.'" *JUUL Labs, Inc. v. Chou*, 557 F. Supp. 3d 1041, 1052–53 (C.D. Cal. 2021), citing *Accuride Int'l Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir. 1989), *Philip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004).

68.     To prevail on a trademark dilution claim, a plaintiff must establish "(1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008).

69.     The Lanham Act bars the false designation of origin, and both the Lanham Act and California state law prohibit unfair competition. 15 U.S.C. § 1125; *Cleary v. News Corp.*, 30 F.3d 1255, 1262 (9th Cir. 1994). "'The elements for establishing unfair competition under California Business and Professions Code § 17200 by trademark infringement and common law trademark infringement are essentially the same as those for the Lanham Act.'" *JUUL Labs, Inc. v. Chou*, 557 F. Supp. 3d 1041, 1053–54 (C.D. Cal. 2021), citing *SV3, LLC v. GG Distrib., Inc.*, No. EDCV 19-0046 JGB (SPx), 2019 WL 1460621, at *3 (C.D. Cal. Feb. 27, 2019). The "ultimate test . . . is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'" *Century 21 Real Estate Corp.*, 846 F.2d at 1178 (quoting *New W. Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1201 (9th Cir. 1979)).

70.     Plaintiffs' Complaint alleges, and by default establishes, Louboutin's ownership and use in interstate commerce of the registered marks at issue, including the CHRISTIAN LOUBOUTIN word mark; the CHRISTIAN LOUBOUTIN and LOUBOUTIN script signature logo marks; the RED SOLE position mark; and the RED SOLE logo mark, each registered with the United States Patent and Trademark Office and incontestible, Registration Nos. 1,816,940; 3,361,597; 3,425,538; 3,206,366; 3,376,197; 3,876,383; 4,654,832; 4,438,425; and 4,442,328. *See*

*also* Compl., Ex. 1. This is prima facie evidence `of Louboutin's ownership of and exclusive right to use their Marks in commerce. *Zobmondo Ent., LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).

71.    The Complaint also alleges, and by default establishes, that Defendant violated Louboutin's exclusive right to the Marks by the conduct described herein and therein, including but not limited to Defendant's promotion and sale of counterfeit goods bearing the already-famous Louboutin Marks through his multiple Facebook and Instagram accounts. The Complaint further establishes a likelihood of consumer confusion through such conduct.

72.    Defendant is liable to Meta for its breach of contract claim.

73.    To state a claim for breach of contract under California law, Meta need only allege facts showing: (1) the existence of a contract; (2) Meta's performance or excuse for non-performance; (3) Defendant's breach; and (4) damage to Meta resulting therefrom. *Craigslist, Inc.*, 694 F. Supp. 2d at 1059.

74.    Meta has satisfied all four elements.

75.    Valid contracts exist between Meta and Defendant. Defendant agreed to the Meta Terms by accessing and using both Facebook and Instagram. Compl. ¶¶ 19-23, 37-40. These allegations, taken as true, are sufficient to establish the existence of a contract under California law. *See Facebook, Inc. v. Grunin*, 77 F. Supp. 3d 965, 970 (N.D. Cal. 2015) ("Grunin agreed to Facebook's Terms when he created a Facebook account and accessed Facebook's services."); *Yelp Inc.*, 70 F. Supp. 3d at 1099 ("Here, the Yelp terms of service is a contract."); *Craigslist, Inc.*, 694 F. Supp. 2d at 1059 ("Plaintiff has alleged that the TOUs existed as a valid contract between it and all users, including the Defendants.").

76.    Meta has "performed all conditions, covenants, and promises required of it in accordance with its agreements with Defendant[]" by allowing Defendant to use Facebook and Instagram, until Meta became aware that he was in breach of the Meta Terms. Compl. ¶¶ 12-16, 19-23, 37-40, 45-49, 102-05. These allegations are sufficient under California law. *See Yelp Inc.*, 70 F. Supp. 3d at 1099 ("Yelp has performed all conditions, covenants, and promises required on its part in accordance with the terms of service."); *Craigslist, Inc.*, 694 F. Supp. 2d at 1059 ("Plaintiff performed by offering and allowing online posting for classified ads.").

77.    Defendant breached Meta's Terms by: (a) using his Facebook and Instagram accounts to advertise and sell counterfeit products, mislead and deceive users, and infringe the intellectual property rights of Louboutin, in violation of Section 3.2.1 (a-c) of the Meta TOS and the Instagram TOU; (b) creating multiple Facebook user accounts and continuing to use Facebook after Meta disabled his accounts for violating the Meta's Terms, in violation of Section 3.1 of the Meta Terms; and (c) continuing to use Instagram after Meta disabled his account for violating the Instagram TOU, in violation of the Instagram TOU. Compl. ¶¶ 12-13, 19-23, 37-40, 46-48.

78.    Defendant's "many breaches have caused Meta to incur damages." *Id.* ¶ 108. This allegation is sufficient to satisfy the fourth element for breach of contract under California law. *See Yelp Inc.*, 70 F. Supp. 3d at 1099 ("As a result of this breach, Catron has caused damage to Yelp."); *Craigslist, Inc.*, 694 F. Supp. 2d at 1059 ("As a direct result of Defendants' actions, Plaintiff suffered monetary and other damages.").

79.    The fourth *Eitel* factor favors default judgment. *Eitel*, 782 F.2d at 1471-72. Plaintiffs only seek injunctive relief. Therefore, there is no risk of Plaintiffs obtaining a windfall. *MOM Enters., Inc. v. Roney Innovations*, No. 20-cv-04850-TSH, 2020 WL 8614101, at *8 (N.D. Cal. Nov. 24, 2020) (since the plaintiff sought "only injunctive relief and no monetary damages, this factor weighs in favor of default judgment").

80.    The fifth *Eitel* factor favors default judgment because no material facts are in dispute since Defendant has not appeared and is in default. "Upon the Clerk's entry of default, Defendant[ was] 'deemed to have admitted all well-pleaded allegations' in the complaint." *Baskin-Robbins*, 2020 WL 2616576, at *9; *see also Coach, Inc. v. Diana Fashion*, No. 11-2315 SC, 2011 WL 6182332, at *3 (N.D. Cal. Dec. 13, 2011) ("Defendants have not responded to any of the proceedings in this case, and thus no dispute has been raised regarding the material averments of the Complaint.").

81.    The sixth *Eitel* factor favors default judgment where, as here, "the defendant has been properly served or the plaintiff demonstrates that the defendant is aware of the lawsuit." *Baskin-Robbins*, 2020 WL 2616576, at *9 (quoting *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1082 (C.D. Cal. 2012). Defendant was properly served with the summons and

Complaint pursuant to the Hague Convention, but has "made no appearance in this [action]." *Yelp Inc.*, 70 F. Supp. 3d at 1100; *Penpower Tech. Ltd. v. S.P.C. Tech.*, 627 F. Supp. 2d 1083, 1093 (N.D. Cal. 2008) (finding factor weighed in favor of default where defendant had not "made an appearance or participated in any manner in this action"); *Facebook, Inc. v. Kokhtenko*, No. 21-cv-03036-YGR (LB), 2021 WL 7448619, at *7 (N.D. Cal. Dec. 3, 2021) ("[D]efendant has not presented a defense or otherwise communicated with the court. . . . [T]his factor supports default judgment."), *report and recommendation adopted as modified by* No. 21-cv-03036-YGR, 2022 WL 1195439 (N.D. Cal. Feb. 18, 2022). Therefore, "[t]here is no basis here to conclude that [Defendant's] default resulted from excusable neglect." *Tech. LED Intell.*, 2019 WL 2716610, at *5.

82.    The final *Eitel* factor balances the entry of default judgment against the preference for deciding cases on the merits and, here, favors default judgment. *Eitel*, 782 F.2d at 1472. "This factor is not dispositive, however, and a defendant's failure to answer the complaint 'makes a decision on the merits impractical, if not impossible.'" *Baskin-Robbins*, 2020 WL 2616576, at *10 (citation omitted). "[T]ermination of a case before hearing the merits is permissible when a defendant fails to defend an action." *Id.* Because Defendant has failed to appear, a "decision on the merits is impossible." *Id.*

83.    All *Eitel* factors weigh in favor of default judgment.

### C.  Plaintiffs Are Entitled to Permanent Injunctive Relief.

84.    Under Federal Rule of Civil Procedure 54(c), a default judgment may include remedies that do not "differ in kind from, or exceed in amount, what is demanded in the pleadings." Both in the Motion and in the Complaint, Plaintiffs seek permanent injunctive relief.

85.    The requirements for Louboutin's permanent injunction are met.

86.    "[I]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by defendant's continuing infringement.'" *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1101 (N.D. Cal. 2014), citing *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1180 (9th Cir. 1988); 15 U.S.C. § 1116(a).

87.    The Lanham Act vests courts with the power to provide permanent injunctive

relief.  *See* 15 U.S.C. § 1116(a). Irreparable harm will result absent such relief and a permanent injunction will serve the public interest. *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1074 (C.D. Cal. 2004).

88.     To obtain a permanent injunction, Louboutin must demonstrate that: (1) it has suffered an irreparable injury; (2) the remedies available at law are inadequate to compensate for the injury; (3) a remedy in equity is warranted after consideration of the balance of hardships between the plaintiff and defendant; and (4) the public interest would not be disserved by a permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

89.     First, irreparable harm to reputation and goodwill is presumed as a matter of law where the plaintiff has demonstrated a likelihood of confusion arising from the infringement." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n. 3 (9th Cir. 1989); see also *GS Holistic, LLC v. Heaven N Sky, Inc*, No. 2:24-CV-07775-SPG-MAR, 2025 WL 3190639, at *11 (C.D. Cal. Apr. 10, 2025). Thus, irreparable harm as to Louboutin is presumed pursuant to the above analysis demonstrating a likelihood of confusion.

90.     The second factor, inadequate remedies available at law, likewise favors permanent injunction. Where, as here, the defendant failed to participate in this litigation, damages, both monetary and to the plaintiff's reputation and goodwill, are not readily ascertainable. See, e.g., *Amini Innovation Corp. v. KTY Int'l Mktg.*, 768 F. Supp. 2d 1049, 1057 (C.D. Cal. 2011).

91.     Third, the balance of hardships weighs in favor of granting a permanent injunction. Defendant has not made an appearance in this case and thus has not submitted any evidence of the hardship he would suffer if an injunction were imposed. In any event, a permanent injunction would only proscribe Defendant's infringing conduct. Conversely, without a permanent injunction, Louboutin would continue to be exposed to the risk of lost profits and goodwill. *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1084 (C.D. Cal. 2012).

92.     Lastly, protecting trademark owners' rights against infringement and preventing consumer confusion serves the public interest. In *Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, 515 F. Supp. 3d 1061, 1082 (N.D. Cal. 2021), the Court found that the defendant's ongoing infringement of the plaintiff's trademark would "harm the public as it will

suggest an inference regarding the origin of the [trademarked produced] that is unsupported in any credible manner. *Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, 515 F. Supp. 3d 1061, 1082 (N.D. Cal. 2021). Here, the defendant's wrongful use of the Louboutin Marks falsely suggests to the consuming public that they would be purchasing luxury goods from a famous French company.

93.    The requirements for Meta's permanent injunction are met.

94.    "A plaintiff may . . . be entitled to injunctive relief for a breach of contract claim under California law," as long as the contract is one for which specific performance is an available remedy. *See Twitch Interactive, Inc. v. Johnston*, No. 16-cv-03404-BLF, 2019 WL 3387977, at *12 (N.D. Cal. July 26, 2019); Cal. Civ. Code §§ 3422, 3423(e). Here, specific performance is an available remedy under the Meta Terms. *See Kokhtenko*, 2022 WL 1195439, at *1 (granting default judgment on Facebook's breach of contract claim and issuing permanent injunction).

95.    Specific performance is available where Meta shows: "(1) the inadequacy of [its] legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract." *Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal. App. 3d 571, 575 (1983). Meta meets all five elements here.

96.    Meta has established that a legal remedy would be inadequate here. *See* Cal. Civ. Code § 3422(a) (permitting a "final injunction" where "pecuniary compensation would not afford adequate relief"). Prior to the filing of this lawsuit, Defendant had already created and used at least 44 Facebook user accounts and at least 32 Instagram users accounts in breach of Meta's Terms. Compl. ¶¶ 37, 38, 105, 106; *see Grunin*, 77 F. Supp. 3d at 973 (finding irreparable harm where Facebook terminated more than seventy accounts associated with defendant).

97.    In addition, Defendant's history of creating successive new Facebook and Instagram accounts, undeterred by Meta's suspension or disabling of other of his accounts, evidences a pattern of recidivism and intentional attempts to bypass Meta's enforcement efforts. Compl. ¶¶ 1, 48. Given Defendant's pattern of behavior, there is a high likelihood that, absent

injunctive relief, Defendant will continue to breach the Meta Terms, which will require Meta to allocate resources to counteract his unlawful activity. Duffey Decl. ¶ 11. In such cases, California courts agree that legal remedies are inadequate, as future breaches will require future expenditures and litigation. *See, e.g.*, *Union Oil Co. of Cal. v. Greka Energy Corp.*, 165 Cal. App. 4th 129, 136 (2008) (where a party commits multiple breaches, specific performance is preferred over the inadequate remedy of repetitive future damage actions); *Tamarind Lithography*, 143 Cal. App. 3d at 575 (future contractual violations might be deemed a continuous breach creating danger of untold number of lawsuits).

98.    Meta has established that the Meta Terms are valid and have been breached, meeting the second element of specific performance. *Supra* Section III(B)(2)(c); Compl. ¶¶ 19-23, 37-47, 102-05; *Grunin*, 77 F. Supp. 3d at 970 (defendant's creation and use of Facebook created a valid contract based on the Facebook terms, which was breached when defendant violated the same); *Sluchevsky*, 2020 WL 5823277, at *7 (same); *Tamarind Lithography*, 143 Cal. App. 3d at 575 (need for finding a contract reasonable and supported by adequate consideration is obviated where there has been a determination of the defendant's breach of that contract).

99.    The element of "requisite of mutuality of remedy has been satisfied in that [Meta] has fully performed [its] obligations pursuant to the agreement,"—*i.e.*, it permitted Defendant to access and use Facebook and Instagram until it discovered he breached the Meta Terms. *See* Compl. ¶¶ 37-48, 103-04; *Henderson v. Fisher*, 236 Cal. App. 2d 468, 473 (1965) (holding for there to be "mutuality of remedies," the "contract must be subject to specific performance by both of the contracting parties"); *Tamarind Lithography*, 143 Cal. App. 3d at 577 ("The requisite of mutuality of remedy has been satisfied in that [the party seeking specific performance] had fully performed his obligations pursuant to the agreement . . . ."); *Kokhtenko*, 2021 WL 7448619, at *6 (finding Facebook "performed all conditions, covenants, and promises required of it in accordance with their [user] agreements with Defendant" by allowing access and use of its platforms).

100.    The Meta Terms are definite, and the requested injunction tracks the exact language of the Meta Terms, thereby satisfying the fourth and fifth elements of specific performance. Meta seeks an order enjoining Defendant "and his agents, servants, employees, successors, and assigns,

and all other persons acting in concert or conspiracy with any of them or who are affiliated with Defendant [] from . . . [a]ccessing or attempting to access Meta's services, platforms, and computer systems, including notably Facebook and Instagram." Compl. at Prayer for Relief ¶ 2(a).

101.    This relief is supported by the Meta Terms. The Meta TOS provides that if Meta "determine[s], in our discretion, that you have clearly, seriously or repeatedly breached [the Meta TOS] or Policies … [Meta] may suspend or permanently disable your access to Meta Company Products, and we may permanently disable or delete your account. [Meta] may also disable or delete your account if you repeatedly infringe other people's intellectual property rights[.]" Duffey Decl. Ex. 2 at 7.

102.    Similarly, the Instagram TOU specifically provides that Meta "can refuse to provide or stop providing all or part of the [Instagram] Service to you (including terminating or disabling your access to the Meta Products and Meta Company Products) immediately … if you … violate [the Instagram TOU] or [Meta's] policies … [or] if you repeatedly infringe other people's intellectual property rights[.]" *Id.* Ex. 1 at 5.

103.    Meta has also demonstrated: "'(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Twitch Interactive*, 2019 WL 3387977, at *11 (citation omitted). Meta has already satisfied the first two elements in connection with its showing on the first specific performance factor above.

104.    Meta also satisfied the remaining two elements. Defendant has not appeared and has not established that he would suffer *any* hardship by being prohibited from using Facebook or Instagram in the future. *See id.* ("Defendants are in default and have not demonstrated that they would incur any hardship from being permanently enjoined against infringing Twitch's trademarks or violating the Terms."). Further, "the public is not disserved by a permanent injunction, particularly *because* the public may have been deceived and harmed by [Defendant's] trademark infringement .... As such, equity favors the entry of a permanent injunction against

[Defendant]." *Id.* at \*12; *see also Grunin*, 77 F. Supp. 3d at 973 ("[T]he public would not be disserved by prohibiting Grunin from posting . . . deceptive ads on Facebook.").

**III. ORDER OF JUDGMENT**

1. Good cause appearing, it is hereby ordered and adjudged as follows:

    a. Defendant Cesar Octavio Guerrero Alejo has:

        i. Breached Defendant's contracts with Meta in violation of California law;

        ii. Violated 15 U.S.C. § 1125(a) and (c) by willfully infringing the Louboutin marks by using false designation of origin and dilution, through the advertising, promotion, offer for sale, and sales of Defendant's counterfeit merchandise; and 15 U.S.C. § 1114 by willfully infringing the Louboutin marks;

        iii. Unfairly competed with Louboutin in violation of Cal. Bus. & Professions Code §§ 17200; and

        iv. Infringed and unfairly competed with Louboutin in violation of the common law of the State of California.

    b. Commencing on the "So Ordered" date of this Judgment and Permanent Injunction, Defendant and his agents, servants, employees, successors, and assigns, and all other persons acting in concert or conspiracy with him or who are affiliated with Defendant who received actual notice of this Order, are hereby permanently enjoined and restrained from doing, or authorizing or procuring any persons to do, any of the following until such time as this Order is dissolved or modified by further Court order:

        i. Accessing or attempting to access Meta's services, platforms, and computer systems, including Facebook and Instagram;

        ii. Creating or maintaining any Facebook or Instagram accounts in violation of the Terms, including the Meta TOS and Instagram TOU;

        iii. Engaging in any activity, or facilitating others to do the same, that violates the Terms, including the Meta TOS and Instagram TOU;

iv. Using the Louboutin marks, or any other mark likely to cause confusion or mistake with the Louboutin marks (including any alternative spellings or variations of those marks) in, on, or with any products or services, or in connection with the advertising, marketing, or other promotion, distribution, offering for sale, or sale, of any products or services, including on websites or social media;

v. Using any false designation of origin, false representation, or any false or misleading description of fact, that can, or is likely to lead the consuming public or individual members thereof, to believe that any products or services, offered, promoted, marketed, advertised, provided, sold, or otherwise distributed by the enjoined parties are in any manner associated or connected with Louboutin, or are licensed, approved, or authorized in any way by Louboutin;

vi. Representing, suggesting in any fashion to any third party, or performing any act that may give rise to the belief that the Enjoined Parties, or any of their products or services, are related to, or authorized or sponsored by, Louboutin;

vii. Registering or maintaining any domain names in the Enjoined Parties' possession, custody, or control that include the word "Christian Louboutin" (including any similar alternative spellings or variations of the word), or that are otherwise confusingly similar to the Louboutin marks;

viii. Registering or maintaining any social media accounts (such as YouTube, LinkedIn, Facebook, Instagram, WhatsApp, or X (formerly Twitter)) that promote the Louboutin marks (including any alternative spellings or variations of the marks);

ix. Unfairly competing with Louboutin in any manner whatsoever, or engaging in any unfair, fraudulent, or deceptive business practices that are related in any way to the production, distribution, marketing, offer for sale, and/or sale

PROPOSED] JUDGMENT AND PERMANENT INJUNCTION                                    - 22 -
CASE NO.: 5:23-CV-05923-NW

of products and services bearing the Louboutin marks, or any other mark or trade name likely to cause confusion with the Louboutin marks or trade name (including any alternative spellings or variations of those marks); and

    x.  Applying for or seeking to register any other mark likely to cause confusion or mistake with the Louboutin marks (including any alternative spellings or variations of the mark or trade name);

c. Defendant must:

    i.  Destroy any remaining inventory of merchandise as well as any and all advertising and promotional materials, displays, marketing materials, web pages, and all other data or things that use the words "Christian Louboutin" (including any similar alternative spellings or variations of the words), or that are otherwise confusingly similar to the Louboutin marks; and

    ii.  File with this Court and serve on Plaintiffs within thirty days after the service of the injunction, a report, in writing, under oath, setting forth in detail the manner and form in which it has complied with the injunction pursuant to 15 U.S.C. § 1116.

d. This Injunction shall apply throughout the world to the fullest extent of this Court's jurisdiction.

e. This is a final judgment as to all claims asserted against Defendant in this action.

f. This Court shall retain jurisdiction for the purpose of making any further orders necessary or proper for the construction, modification, or enforcement of this Judgment and Permanent Injunction, and the punishment for any violations thereof.

g. Plaintiffs shall serve this Judgment and Permanent Injunction on Defendant at the same address at which Defendant was served via international mail.

This matter is dismissed with prejudice

**IT IS SO ORDERED**.

Dated: March 30, 2026

_____
United States District Judge
Noel Wise

PROPOSED] JUDGMENT AND PERMANENT INJUNCTION    - 23 -
CASE NO.: 5:23-CV-05923-NW

DATED:  February 3, 2026          Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By: */s/ Caroline Y. Barbee* _____
     DENNIS L. WILSON
     CAROLINE Y. BARBEE
     KRISTIN M. ADAMS

Attorneys for Plaintiff
META PLATFORMS, INC.

DATED:  February 3, 2026          Respectfully submitted,

ARENT FOX SCHIFF LLP

By: */s/ Kirsten A. Hart* _____
     KIRSTEN A. HART
     OSCAR A. FIGUEROA

Attorneys for Plaintiffs
CHRISTIAN LOUBOUTIN S.A.S.,
CHRISTIAN LOUBOUTIN L.L.C., and
CLERMON ET ASSOCIES